UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
JOSEPH FULDA,
MALKA FULDA

      Plaintiffs,       **Docket No.:  20-cv-8846**

  -against-          **COMPLAINT**

                **JURY TRIAL DEMANDED**

MARC EISENSTADT a/k/a MEIR EISENSTADT,
AUTO FILLING SERVICES, LLC,
CHESED 1, LLC,
M.S. PETROLEUM, LLC,
BLUE JAY PETRO, LLC,
FUELFILLED INC,
HELEN EISENSTADT,
AARON KNOPFLER,
SHIRLEY KLEINBART,
JAY EISENSTADT,
IRA EISENSTADT,
AVIGAIL EISENSTADT,
YAAKOV YOUNG,
MICHAEL WEISS,
ARI MARBURGER,
MOSHE WALDMAN,
AMERICAN EXPRESS, INC.,

      Defendants.
---------------------------------------------------------X


Plaintiffs, JOSEPH FULDA and MALKA FULDA, by and through counsel,

respectfully submit this Complaint as follows:

## **INTRODUCTION**

1

1.     This is an action against Marc a/k/a Meir Eisenstadt, ("Eisenstadt"), and the various members, employees and associates of Eisenstadt and Auto Filling Services, LLC ("AFS" or the "Family"), for their fraudulent and corrupt actions undertaken as part of an ongoing scheme to unlawfully defraud Plaintiffs and others like them and to enrich themselves at Plaintiffs' expense.

2.     Defendants have planned, orchestrated, and executed a brazenly fraudulent scheme with the target objective of obtaining substantial sums of money in the form of investments, dispersing the funds throughout their network of family members, businesses and associates, and attempting to abuse and distort the  rules and practices of their religious community to avoid repaying the debts that they incurred.

3.     Plaintiffs, who are among the victims of the community caught in Defendants' dragnet, have suffered substantial damages as a result of Defendants' illegal actions.  Defendants have cut a predatory swath through the Orthodox Jewish community, relying upon word of mouth from their allies to obtain funds under fraudulent pretenses and leaving behind a trail of lawsuits, failed arbitrations, and unresolved debts that shows no sign of abating.  Defendants have turned the religious guidelines of the community on their heads by their dishonest actions.

4.     Eisenstadt, along with his mother Helen Eisenstadt ("Helen") and Aaron Knopfler ("Knopfler"), were equal owners of AFS, with Eisenstadt acting as

2

the manager.  AFS, a company set up to sell and deliver fuel as well as to supply refueling to truckers, had or has several associated "companies" – including Chesed 1, LLC ("Chesed"), M.S. Petroleum, LLC ("M.S."), Blue Jay Petro, LLC ("Blue Jay") and, eventually, FuelFilled Inc. ("FuelFilled").  Eisenstadt's brothers, Ira Eisenstadt ("Ira") and Jay Eisenstadt ("Jay") lacked formal roles in the businesses but transferred funds in and out of the business accounts, as well as on occasion putting themselves forward as representatives of the Eisenstadt family.

5.      Beginning on or about November of 2016, Defendant Eisenstadt contacted Plaintiff Joseph Fulda ("Fulda") through Defendant Michael Weiss ("Weiss") seeking a short term loan.  Weiss showed Fulda a set of credit card processing statements and profit and loss statements intended to make AFS look like a successful company doing more than a million dollars a year in business.  In this initial contact, Fulda did not deal with Eisenstadt directly.  Instead, the parties entered into a *Heter Iska* investment agreement through Weiss.  This investment, which appears to have been designed to gain Fulda's confidence and lull him into a belief that Eisenstadt and AFS were legitimate, was successfully concluded.

6.      Fulda did not deal with Eisenstadt again until March of 2018, although Weiss did try to persuade him to enter into another investment in July of 2017.  Weiss made the initial approach to Fulda.  This time, however, Fulda asked to speak directly with Eisenstadt, and did so.  On this occasion Weiss – and Eisenstadt as well

– presented inaccurate and misleading financial documents, representing that AFS was doing even more business and generating greater profits than the 2016 records had shown.  Fulda spoke to both Eisenstadt and Eisenstadt's Chief Operating Officer, Yaakov Young ("Young") on several occasions, trying to ensure that Eisenstadt was offering a legitimate investment opportunity and that he would be able to repay the investment in the agreed upon timeframe.  At the end of March, 2018, Fulda signed an investment agreement providing AFS with a capital infusion of $150,000.00 that was specifically designated for the use of certain customers' accounts.  The investment agreement was drafted by Eisenstadt's Rabbi, Rabbi Ari Marburger ("Marburger") and named specific allegedly profitable customers whose accounts had been in good standing for at least twelve months and for whose use the funds were designated.

7.     Having successfully captured Fulda's trust, Eisenstadt and Young requested an additional investment in early April, making the initial request via email less than a week after agreeing upon the first investment and referencing specific customers whose fuel purchases would be covered by the infusion of capital. Fulda invested an additional $100,000.00, again designating the funds for the use of specified accounts. Both the March and April agreements were made between Fulda and AFS, with Eisenstadt signing on behalf of AFS.

8.    Following this additional investment, Fulda made efforts to become more involved in the business operations of AFS.  Fulda communicated with both Eisenstadt and Young, who provided him with Excel spreadsheets created to paint a picture of a healthy, profitable company with a steady base of customers and impressive cash flow volume.  In return, Fulda began offering assistance and recommendations in addition to his financial investments, even going so far as to negotiate favorable contract terms with potential customers on AFS' behalf.

9.    In May of 2018, Eisenstadt contacted Fulda while he was away on vacation with his wife, Malka Fulda ("Malka").  Eisenstadt claimed that AFS needed a very short term cash infusion and suggested that, as Fulda was not at home, he could provide the funds by credit card.  Eisenstadt claimed that the full amount would be repaid within two weeks, well before the charges could come due on Fulda's statement.  Fulda agreed, believing that he would see a single large transaction to cover the funds.  What instead took place was the following; Chesed charged 27 separate transactions on three separate dates to Malka's American Express card totaling $227,398.90.  American Express failed to catch or flag the multiple charges as fraudulent, despite their clear departure from Malka's previous spending pattern.  Fulda learned that the funds were not used to supply fuel and immediately sought repayment and an explanation from Eisenstadt, neither of which

were forthcoming.  Fulda attempted to resolve the issue of these charges with Eisenstadt over the next few months without success.

10.     Before receiving Malka's credit card statement, on May 16, 2018, Fulda wired an additional $140,000.00 investment to AFS and Eisenstadt, again with the explicit understanding that these funds were to be used for specific customer accounts and would be repaid within two weeks.  By the end of May, however, Eisenstadt's scheme began to unravel as Fulda put more work into the business and continued asking for detailed information.  On May 25, 2018, Eisenstadt sent Fulda a revised balance sheet and profit and loss statement for 2017, both of which showed less profitable numbers than the information that Eisenstadt, Weiss and Young had previously provided and that Fulda had relied upon in making his investment decisions.

11.     On May 30, 2018, Weiss sent Fulda $6,000.00 as his portion of the earnings on the initial $150,000.00 investment that had been made through Weiss. Weiss and Eisenstadt claimed that payment of the remaining amounts due to Fulda on his investments – which now totaled in excess of $600,000.00 – would be made imminently by Eisenstadt.  Reassured, Fulda continued to work at negotiating contracts on AFS's behalf.  Meanwhile, Eisenstadt continued to put him off and ask for more extensions, claiming that he was hard at work on obtaining significant financing from banks including American Express. Indeed, Eisenstadt represented

that he was so invested in continuing to grow the business that he had hired two consultants specifically for the purpose of financing and growing the business.

12.    Throughout the month of June, 2018, the pattern continued of Eisenstadt seeking Fulda's help with contract negotiations on the one hand while putting him off with promises that the company's cash flow issues were about to be resolved and that all was going well on the other hand.  On June 15, 2018, the parties agreed in principle to combine all of the outstanding investments into a single investment document representing the principal amount of $640,000.00 owed by Eisenstadt and AFS to Fulda.  Eisenstadt – or Marburger – drafted a document and sent it to Fulda, who did not sign it as Eisenstadt had amended some of the terms without his consent.  Eisenstadt made a nominal payment at that time despite the fact that the investment contract remained unsigned.

13.    On July 5, 2018, Fulda met with Eisenstadt and Young along with a potential new client to negotiate a possible future business relationship.  Following that meeting, Fulda took Eisenstadt and Young to meet with his personal banker at Signature Bank. It was after the bank meeting that Fulda began to realize for the first time the depth of Eisenstadt's deception, when it became clear that the actual financial status of AFS was not what Fulda had been told.  Fulda received a phone call shortly after the meeting had ended from one of the consultants hired by Eisenstadt, saying that there appeared to be approximately a million dollars in debt

that was not reflected in the books of the business and that there were multiple unexplained credit card charges. Fulda confronted Eisenstadt, who claimed that the debt was personal and that he "meant to tell" Fulda everything about it. Fulda immediately demanded a return of his investment and an end to the business relationship between himself and Eisenstadt and his associates.

14.     Throughout July and August, Eisenstadt made a few minimal payments but overall failed to follow through on any of the many different payment schedules that he proposed. Finally, on August 29, 2018, Fulda emailed Eisenstadt trying to find out what was happening and what his intentions were regarding Fulda's investments and the outstanding balance due. Eisenstadt responded by saying that he would only communicate through his family's attorney and cutting off further contact.

15.     Following this shocking communication from Eisenstadt, in September of 2018 Fulda and Malka formally contested the multiple charges from Chesed that had been made on Malka's American Express account. Malka explained that she and Fulda had received no services from Chesed and that they had been unsuccessful in resolving the dispute with the merchant. After some back and forth communications, American Express represented to both Fulda and Malka that they were unable to pursue the claim because it had been made outside of their 60 day window. According to Eisenstadt's representative, however, American Express did

reverse the charges and is now in possession of the funds charged by Chesed to Malka's account.

16.     Also in September of 2018, Eisenstadt emailed Fulda admitting for the first time that AFS was struggling financially and, in essence, saying that if Fulda hoped to be repaid he had to leave Eisenstadt alone while he "fixed" the situation. Fulda sent follow-up emails, attempting to learn the state of AFS and Eisenstadt's plans, in October, November and December of 2018.   Fulda never received a response from Eisenstadt, although an attorney/accountant purporting to represent Eisenstadt, Eli Leshkowitz ("Leshkowitz"), reached out in mid-December to claim that the business was arranging alternative financing to take care of debts including the money owed to Fulda.  Leshkowitz did not respond to any of Fulda's efforts to communicate with him after that initial contact.

17.     On March 20, 2019, more than six months after Eisenstadt had last paid anything towards his debt to Fulda, Fulda sent another email to Eisenstadt detailing the history of the debt and again seeking information as to whether and when Eisenstadt intended to repay it. When he once again received no response, Fulda reached out to Marburger, hoping that Marburger could negotiate with Eisenstadt. In addition to having drafted the original investment contract, Marburger had previously informed Fulda that he had spoken with Eisenstadt in the fall of 2018 and received assurances from Eisenstadt that all was in order and his debts would be

repaid.  Marburger agreed to arrange a meeting, although he did later charge a fee for this service.

18.    Finally, on April 28, 2019, Eisenstadt and Marburger met with Fulda to negotiate a reduced payment amount and schedule.  During the meeting, Eisenstadt admitted that he had misrepresented AFS's finances in his initial dealings with Fulda, both by withholding information and by providing inaccurate information in his Excel spreadsheets.  Although Fulda did accept Defendants' proposal to resolve the debt for the reduced amount of $590,000.00, Eisenstadt soon made it clear that this agreement had merely been another subterfuge.  Eisenstadt had claimed that Leshkowitz would draft the agreement within the next few days and had agreed to an initial payment of $90,000.00, claiming that he ran several businesses.  No agreement was ever drafted, however, and although Fulda did receive two small payments of $5,000.00 each, Eisenstadt again disappeared and stopped communicating after blaming the failure to draft the agreement on Leshkowitz.

19.    In June of 2019, more than a month after the final meeting with Eisenstadt and Marburger, Fulda approached Bais Din Maysharim ("BDM"), the Rabbinical Court designated by Eisenstadt in the original investment documents for

arbitration in the event of a breach of the contract.  The first *Hazmana*[1] issued from BDM to Eisenstadt on June 4, 2019.  A representative contacted BDM on Eisenstadt's behalf to say that he would represent him but did not follow up and Eisenstadt never contacted BDM directly.  As a result, a second *Hazmana* was issued on June 28, 2019, setting a date before BDM of July 9, 2019.  When Eisenstadt again failed to appear and no one contacted the Court on his behalf, the third *Hazmana* issued.

20.    Finally, following the issuance of the third *Hazmana*, Eisenstadt through his representative contacted BDM to say that he was prepared to enter into arbitration before a Rabbinical Court, but that he wanted the matter heard by Bais Din Mechon L'hoyroah ("BDML").  Fulda agreed and scheduled an August date before BDML; Eisenstadt, however, had the matter adjourned before even appearing, and the parties had their first contact in months in front of BDML on September 3, 2019.

21.    Eisenstadt's representative admitted to BDML that Fulda had invested all of the funds described above but claimed that Eisenstadt had simply lost the

---

[1] A *Hazmana* is a document issued by the Rabbinical Court summoning the respondent to enter into arbitration before the Court.  A respondent can 1) accept the issuing Court's jurisdiction, 2) propose a different Bais Din Court to decide the case, 3) propose a panel of selected arbitrators through a *Zabla*, or 4) attempt to show that the dispute falls outside of the jurisdiction of the Bais Din system.  Jewish law provides for sanctions against a respondent who fails to answer three *Hazmana* and will, if a respondent is particularly uncooperative with the arbitration process, issue a *Heter Arkaos* permitting the claimant to pursue his case in secular court without religious penalty.

money and that all of his claims were documented.  When Fulda's advocate made clear the false representations from Eisenstadt that he had learned about thus far, BDML requested documents from Eisenstadt and from Leshkowitz supporting his defense.  Eisenstadt claimed that he would comply with BDML's demand for records but said that he did not want any records given to Fulda, as he was afraid that Fulda would provide them to the District Attorney's Office.

22.    BDML made more than half a dozen requests for the records supposedly held by Leshkowitz without response; finally, at the end of September, Leshkowitz told BDML that he did not have any documents after all and that Eisenstadt would handle the document production.  Another month passed without any records being provided to either Fulda or BDML.  At the end of October, Fulda's advocate asked BDML to issue a judgment on his behalf, as the records were still outstanding.  He repeated this request at the beginning of November, 2019.

23.    On November 7, 2109, BDML made a "final" request to Eisenstadt for the records that he had described two months earlier.  Rather than receiving a response from Eisenstadt or his advocate, Eisenstadt's brother Ira contacted BDML saying that the family was now handling the matter and asking for another 30 to 45 days for Leshkowitz to prepare and produce the documents.  BDML agreed to allow the family additional time to comply over the objection of Fulda's advocate, who

pointed out that the records had been sought without success for more than two months and that Leshkowitz had already denied having anything to produce.

24.     On November 23, 2019, a new advocate contacted BDML on behalf of the Eisenstadt family, asking for an additional two weeks.  BDML again agreed.

25.     On December 6, 2019, after the two weeks had passed and there were still no documents forthcoming, Fulda's advocate renewed his request for BDML to issue their judgment on the matter.  Once again, Eisenstadt asked for more time to comply and once again BDML agreed to wait.

26.     At some point during the month of December, Fulda learned for the first time that he was not the only victim of Eisenstadt's fraudulent schemes.  Two suits had been filed the previous month in Rockland County Supreme Court. The first alleged that Eisenstadt, AFS, Chesed, M.S. and Blue Jay had made fraudulent misrepresentations as part of a "Ponzi scheme" effort to obtain loans from the plaintiffs, that such loans were obtained between December 2018 and May 2019, during the time period that Eisenstadt was refusing to repay Fulda, and that as a result, Defendants had stolen more than $285,000.00 from the plaintiffs in that matter.  The second suit sought to enforce an arbitration provision in an investment agreement very similar to that entered into by Fulda in which Eisenstadt, his wife Shirley Kleinbart ("Kleinbart") and AFS had received $200,000.00 from yet another

investor on July 27, 2018, had breached the contract, and had been avoiding the jurisdiction of the Rabbinical justice system.

27.    Fulda was also shocked to learn about the level of involvement of Moshe Waldman ("Waldman"), a Rabbi in Israel who was one of the signatories to the investment agreement that formed the basis of the second Rockland County filing.  Fulda learned that Waldman was processing multiple credit card charges in a circular fashion for Eisenstadt and his businesses, without any products or services being exchanged.  This credit card processing scheme had been used by Eisenstadt to inflate the apparent revenues of his businesses, as well as to generate funds without ever actually repaying them.

28.    On December 18, 2019, BDML sent yet another request for documents, this time seeking them from Eisenstadt, Leshkowitz, and two additional people. Only one of the recipients responded, yielding the first paperwork that BDML had received from anyone on Eisenstadt's behalf since the matter had started over three months earlier.  On December 30, 2019, at the request of Fulda's advocate, BDML renewed its document request from all of the parties who had yet to respond.

29.    On January 3, 2020, Eisenstadt's advocate provided a single profit and loss statement.  As this was not an original document and failed to support Eisenstadt's claims, BDML sent yet another document request on January 9th.  When

this request, like the many preceding it, failed to obtain a response, Fulda's advocate renewed his request for BDML to issue its judgment.

30.    On January 15, 2020, Eisenstadt finally responded by supplying documents, many in the form of Excel spreadsheets, that were actually responsive to BDML's repeated demands.    Fulda hired two accountants to review the paperwork, finding multiple irregularities including:

a.  There were numerous bank accounts and business accounts that Fulda had been completely unaware of, showing the steady shifting of funds between the Defendant entities;

b.  The businesses allegedly did a combined total of approximately 7-8 million dollars in sales but somehow had debits and deposits in excess of 80 million dollars;

c.  Multiple transfers in and out of the businesses were made to family members.  Some were made to or on behalf of Helen, who was a part owner of the business, but there were also several transfers to Ira, Jay , Kleinbart and Avigail Eisenstadt ("Avigail");

d.  On the date of Fulda's initial $150,000 investment, $140,000 was transferred to Helen and $9,000 to Waldman in spite of the specific restriction in Fulda's investment agreement limiting the use of his funds to designated customers of the business.

31.     Following these shocking disclosures, BDML held a second session on the matter on January 30, 2020.  Eisenstadt and his representative admitted for the first time that he had needed Fulda's investment so that Helen would continue to loan money to AFS.  Eisenstadt also admitted that he and Waldman had been cycling credit charges as a further way of both financing the business and inflating the revenue numbers so that it appeared that there were more business transactions than actually existed.  Finally, Eisenstadt provided profit and loss statements to BDML during the same session that contained yet another version of the AFS finances.

32.     BDML completed their fact finding at the January 30th session; however, Eisenstadt had not yet paid his half of the fees for their work.  This further delayed the issuance of a judgment.  Finally, on February 10, 2020, BDML issued a *Psak Din* ordering Eisenstadt to pay $400,000.00 to Fulda.  Eisenstadt and his advocate pressed for BDML to reopen the matter and hold an additional hearing; Fulda agreed to another session if Eisenstadt would place funds in escrow to cover the judgment.  Eisenstadt refused to place funds in escrow, but continued to claim that he would abide by BDML's ruling and just wanted a truthful resolution; Eisenstadt did not, at this point, claim an inability to repay the debt but continued to contest the validity of the debt itself, a position that he had taken for the first time in front of BDML.

33.    Two more weeks passed without any further word from Eisenstadt.  On February 26, 2020, Fulda's advocate informed BDML and Eisenstadt's advocate that, unless the judgment was paid, Fulda would seek to have it confirmed in a secular court in March.  The following day, multiple confessions of judgment were filed against both Eisenstadt and AFS in Rockland County Supreme Court; the confessions of judgment, most of which had been signed months earlier, were all on behalf of Zomi Management, a "company" managed solely by Jay.  The effect of the immediate filing of these confessions of judgment, regardless of their legitimacy or lack thereof,[2] was to push Fulda's as yet unfiled claim to the back of the line, thus essentially rendering Eisenstadt and AFS judgment-proof.

34.    On March 2, 2020, when Eisenstadt continued to ignore the BDML *Psak*, BDML finally lost patience.  BDML issued a *Heter Arkaos* – a document allowing Fulda to pursue his claims in a secular court – with unusually broad language.  The *Heter* noted that Eisenstadt was refusing to comply and granted Fulda blanket permission to pursue his claim against Eisenstadt civilly.

35.    Despite the issuance of the clear *Heter*, Fulda and his advocate continued to attempt to negotiate with Eisenstadt through his advocate.  Fulda

---

[2] It is clear that Jay, and through him Zomi Management, had prepared the confessions of judgment in advance of filing.  Jay's counsel, Steven J. Shore, Esq., ensured a clear paper trail protecting the interests of Jay that was now being used to protect the interests of Eisenstadt and his entities as well through the suspiciously timed filings.

remained concerned that pursuing his full claim could cause a rift in the religious community.  As a result, he tried for several months to persuade Eisenstadt to make good on his debts.  On May 1, 2020, Fulda's advocate spoke with Ira and another of Eisenstadt's brothers in a final effort to make the family aware of the seriousness of the situation.   Ira disregarded the BDML judgment but offered to settle for approximately 20% of what Fulda was owed.

36.    Following the May 1st phone conversation, Fulda and his relatives received threatening phone calls and pressure was brought to bear on him through the Orthodox community in an effort to convince him not to pursue Eisenstadt or any of his accomplices for the $640,000 debt.  Pressure came in the form of a letter and calls to Fulda, his family members, and to at least one Rabbi with whom Fulda had consulted in his quest to remain within the bounds of his religious tenets.

## JURISDICTION AND VENUE

37.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332(a)(1).

38.    Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2) or, alternatively, 28 U.S.C. § 1391(b )(3).

## THE PARTIES

39.    Plaintiff Joseph Fulda is a resident of Queens County, New York.

40.     Plaintiff Malka Fulda is Joseph Fulda's wife.  She is a resident of Queens County, New York.

41.     Defendant Marc Eisenstadt a/k/a Meir Eisenstadt is the primary manager and owner of the Defendant business entities.  He is a resident of Rockland County, New York.

42.     Defendant Auto Filling Services LLC is a domestic limited liability company with primary corporate offices in Rockland County, New York.

43.     Defendant Chesed 1 LLC is a domestic limited liability company with primary corporate offices in Ocean County, New Jersey.

44.     Defendant M.S. Petroleum LLC is a domestic limited liability company with primary corporate offices in Rockland County, New York.

45.     Defendant Blue Jay Petro LLC is a domestic limited liability company with primary corporate offices in Ocean County, New Jersey.

46.     Defendant Fuelfilled Inc. appears to be the successor business to AFS, operating with the same personnel and equipment but under a different name, with primary corporate offices in Essex County, New Jersey.

47.     Defendant Helen Eisenstadt is the mother of Meir Eisenstadt and an equal shareholder in AFS.  She is a resident of Kings County, New York and maintains a second residence in Rockland County, New York.

48.      Defendant Aaron Knopfler is or was the third partner/shareholder in AFS.  He is a resident of Rockland County, New York.

49.      Defendant Shirley Kleinbart is the wife of Meir Eisenstadt who has received economic transfers from the businesses and who appeared before BDML to make representations on Eisenstadt's behalf.   She is a resident of Rockland County, New York.

50.      Defendant Jay Eisenstadt is one of the brothers of Meir Eisenstadt and the principal shareholder of Zomi Management, which filed multiple confessions of judgment against AFS the day after Fulda announced his intention to file.  He is a resident of Kings County, New York.

51.      Defendant Ira Eisenstadt is another brother of Meir Eisenstadt who received economic transfers from the businesses and who contacted both Fulda and BDML to attempt to negotiate on Eisenstadt's behalf.  He is a resident of Kings County, New York.

52.      Defendant Avigail Eisenstadt is the wife of Ira Eisenstadt and also received economic transfers from the businesses.  She is a resident of Kings County, New York.

53.      Defendant Yaakov Young was the chief corporate officer of AFS who negotiated some of the details of Fulda's initial investments and participated in

providing false business records to encourage those investments.  He is a resident of Ocean County, New Jersey.

54.     Defendant Michael Weiss first solicited Fulda's investment in AFS and later admitted that he was aware that the numbers provided by Eisenstadt were not accurate.  He is a resident of Ocean County, New Jersey.

55.     Defendant Ari Marburger drafted the investment agreements on Eisenstadt's behalf.  He is a resident of Ocean County, New Jersey.

56.     Defendant Moshe Waldman is a Rabbi who has received economic transfers from the businesses, has co-signed some agreements on behalf of AFS, and who is responsible for cycling credit card charges disguised as revenue.  He is a resident of Israel.

57.     Defendant American Express, Inc. is an American multinational financial services company headquartered in New York, New York.

## FACTUAL BACKGROUND

### The Fraudulent Statements

58.     On March 21, 2018, Michael Weiss approached Joseph Fulda, seeking a $500,000 investment in AFS on Eisenstadt's behalf.  Eisenstadt had provided Weiss with a chart showing monthly credit card sales at AFS surpassing $700,000.; Weiss attached this chart in his email to Fulda.  Although this contact was from Weiss, Fulda spoke directly with Eisenstadt over the phone several times over the

next few days.   In each conversation, Eisenstadt repeated the financial representations contained in Weiss' email, as well as making specific claims about the path of the funds flow at AFS.  Fulda relied on these representations, which were false.

59.   On March 27, 2018, Young sent an email to Fulda repeating the request for $500,000 and listing specific customers and alleging specific monthly cash flow amounts for each customer.   Young provided documentation in the form of spreadsheets supporting these financial claims.  Fulda relied on these additional representations, which were false.

60.   On March 30, 2018, based on the false representations made by Eisenstadt and Young over the previous few days, Fulda signed an investment agreement providing AFS with a capital infusion of $150,000.00 that was specifically designated for and limited to the use of certain customers' accounts.

61.  Having successfully captured Fulda's trust with their misrepresentations, Eisenstadt and Young requested an additional investment on April 4, 2018, less than a week after agreeing upon the first investment.  Fulda spoke with Eisenstadt over the phone again; Eisenstadt emphasized the need for the additional funds, which would be directed to cover the account of a specific client. Eisenstadt repeated his previous false representations regarding the size of this client in order to persuade Fulda that maintaining the client was essential to the business

of AFS.  Fulda agreed and invested an additional $100,000.00, again designating the funds for the use of specified accounts and customers, later that same day.  Both the March and April agreements were made between Fulda and AFS, with Eisenstadt signing on behalf of AFS.

62.     Following this additional investment, Fulda made efforts to become more involved in the business operations of AFS.  On April 11, 2018, Fulda met with both Eisenstadt and Young, who showed him an iPad with Excel spreadsheets created to paint a picture of a healthy, profitable company with a steady base of customers and impressive cash flow volume.  These documents further supported the figures and representations quoted by Eisenstadt and Young during the negotiations to obtain Fulda's March and April investments.  In return for this documentary proof, which lent a further air of credibility to the false statements, Fulda began offering assistance and recommendations in addition to his financial investments, even going so far as to negotiate favorable contract terms with potential customers on AFS' behalf.

63.     On April 13, 2018, Eisenstadt emailed Fulda a spreadsheet purporting to show customers, locations, profit margins and frequencies.  This information, which was false, was intended to and did further the image of AFS as a profitable, rapidly growing business.

64.    On April 16, 2018, Young emailed Fulda an April finance report for AFS, again intended to falsely portray the business as profitable and growing. On or about that same date, Eisenstadt sent a 2017 profit and loss statement with matching numbers that similarly falsely portrayed AFS as financially robust.

65.    On May 2, 2018, Eisenstadt contacted Fulda while he was away on vacation with his wife, Malka Fulda. Eisenstadt claimed that AFS needed a very short term cash infusion for Fulda's designated customers and suggested that, as Fulda was not at home, he could provide the funds by credit card. Eisenstadt claimed that the full amount would be repaid within two weeks, well before the charges could come due on Fulda's statement. Fulda agreed, believing that he would see a single large transaction to cover the funds. What instead took place was the following; Chesed charged 27 separate transactions on three separate dates to Malka's American Express card totaling $227,398.90. Although this pattern of charges was completely inconsistent with charges made by Malka on that credit card previously, American Express inexplicably failed to catch or flag the multiple charges as fraudulent. This failure left Fulda and Malka unaware of the pattern of the charges until late May when the credit card statement was issued. Before May of 2018, Fulda had not heard of Chesed and had been unaware of the related businesses. More importantly, there was no indication that Fulda's designated customers had received the fuel for which Fulda had agreed to pay, nor had Eisenstadt, Chesed or AFS made

any effort towards repayment. Fulda immediately sought repayment and an explanation from Eisenstadt, neither of which were forthcoming. Fulda attempted to resolve this particular debt with Eisenstadt on multiple occasions over the next few weeks and months with no success.

66.    On May 16, 2018, before receiving Malka's credit card statement, Fulda wired an additional $140,000.00 investment to AFS and Eisenstadt, again with the understanding that these funds were to be used for specific customer accounts. This time, the agreement was that the funds would be repaid within two weeks. By the end of May, however, Eisenstadt's scheme began to unravel as Fulda put more work into the business and continued asking for detailed information. On May 25, 2018, Eisenstadt sent Fulda a revised balance sheet and profit and loss statement for 2017, both of which showed numbers that, although still profitable, were lower than the information that Eisenstadt, Weiss and Young had previously provided and that Fulda had relied upon in making his previous investment decisions.

67.    On May 30, 2018, Weiss sent Fulda $6,000.00, which represented Fulda's earnings on the initial $150,000.00 investment. Weiss and Eisenstadt assured Fulda that payment of the remaining amounts due to Fulda on his investments – which now totaled in excess of $600,000.00 – would be made imminently by Eisenstadt. Reassured, Fulda continued to work at negotiating contracts on AFS's behalf. Meanwhile, Eisenstadt continued to put him off and ask

for more extensions, claiming that he was hard at work on obtaining significant financing from major financial institutions, including American Express, and representing that he had taken on additional staff in the form of consultants hired for that purpose.

## Defendants Evade Repayment

68.   Throughout the month of June, 2018, the pattern continued of Eisenstadt seeking Fulda's help with contract negotiations on the one hand while putting him off with promises that the company's cash flow issues were about to be resolved and that all was going well on the other hand.  On June 15, 2018, the parties agreed in principle to combine all of the outstanding investments into a single investment document representing the principal amount of $640,000.00 then owed by Eisenstadt and AFS to Fulda.  Eisenstadt sent a document memorializing the combined investment amount to Fulda, who did not sign it as Eisenstadt had amended some of the terms without his consent.  Eisenstadt made a nominal payment at that time despite the fact that the investment contract remained unsigned.

69.   On July 5, 2018, Fulda met with Eisenstadt and Young along with a potential new client to negotiate a possible future business relationship.  Following that meeting, Fulda took Eisenstadt and Young to meet with his personal banker at Signature Bank. It was after the bank meeting that Fulda began to realize for the first time the depth of Eisenstadt's deception, when it became clear that the actual

financial status of AFS was not what Fulda had been told.  Fulda received a phone call shortly after the meeting had ended from one of the consultants hired by Eisenstadt, saying that there appeared to be approximately a million dollars in debt that was not reflected in the books of the business and that there were multiple unexplained credit card charges.  Fulda confronted Eisenstadt, who claimed that the debt was personal and that he "meant to tell" Fulda everything about it.  Fulda immediately demanded a return of his investment and an end to the business relationship between himself and Eisenstadt and his associates.

70.    Throughout July and August, Eisenstadt made a few minimal payments but overall failed to follow through on any of the many different payment schedules that he proposed.  Finally, on August 29, 2018, Fulda emailed Eisenstadt trying to find out what was happening and what his intentions were regarding Fulda's investments.  Eisenstadt responded by saying that he would only communicate through his family's attorney and cutting off any further contact.

71.    On September 7, 2018 Eisenstadt emailed Fulda, admitting for the first time that AFS was struggling financially and, in essence, saying that if Fulda hoped to be repaid he had to leave Eisenstadt alone while he "fixed" the situation.  Fulda sent follow-up emails, attempting to learn the state of AFS and Eisenstadt's plans, in October, November and December of 2018.  Fulda never received a response from Eisenstadt, although Leshkowitz, an attorney/accountant purporting to represent

Eisenstadt, reached out in mid-December to claim that the business was arranging alternative financing to take care of debts including the money owed to Fulda. Leshkowitz did not respond to any of Fulda's efforts to communicate with him after that initial contact.

72.     On March 20, 2019, more than six months after Eisenstadt had last paid anything towards his debt to Fulda, Fulda sent another email to Eisenstadt detailing the history of the debt and again seeking information as to whether and when Eisenstadt intended to repay it. When he once again received no response, Fulda reached out to Rabbi Marburger, hoping that Marburger could negotiate with Eisenstadt.  Marburger agreed to arrange a meeting.

73.     Finally, on April 28, 2019, Eisenstadt and Marburger met with Fulda to negotiate a reduced payment amount and schedule.  During the meeting, Eisenstadt admitted that he had misrepresented AFS's finances in his initial dealings with Fulda, both by withholding information and by providing inaccurate information in his Excel spreadsheets.  Although Fulda did accept Defendants' proposal to resolve the debt for the reduced amount of $590,000.00, Eisenstadt soon made it clear that this agreement had merely been another subterfuge.  Eisenstadt had claimed that Leshkowitz would draft the agreement and had agreed to an initial payment of $90,000.00.  Consistent with the pattern that Eisenstadt had established, he failed to follow through with his own proposed payment schedule.  No agreement was ever

drafted by Leshkowitz, and although Fulda did receive two small payments of $5,000.00 each, Eisenstadt again disappeared and stopped communicating after blaming the failure to draft the agreement on Leshkowitz.

74.    In June of 2019, more than a month after the final meeting with Eisenstadt and Marburger, Fulda approached BDM, the Rabbinical Court designated by Eisenstadt in the original investment documents for arbitration in the event of a breach of the contract.  The first *Hazmana* issued from BDM to Eisenstadt on June 4, 2019.  An advocate contacted BDM on Eisenstadt's behalf to say that he would represent him but did not follow up and Eisenstadt never contacted BDM directly. As a result, a second *Hazmana* was issued on June 28, 2019, setting a date before BDM of July 9, 2019.  When Eisenstadt again failed to appear and no one contacted the Court on his behalf, the third *Hazmana* issued.

75.    Finally, following the issuance of the third *Hazmana*, Eisenstadt's representative contacted BDM to say that he was prepared to enter into arbitration before a Rabbinical Court, but that he wanted the matter heard by BDML.  Fulda agreed to the change in forum and scheduled an August date before BDML; Eisenstadt, however, had the matter adjourned before even appearing, and the parties finally had their first contact in months in front of BDML on September 3, 2019.

76.    Eisenstadt's representative admitted to BDML that Fulda had invested all of the funds described above but for the first time claimed that Eisenstadt had

simply lost the money and that all of his claims were documented.  When Fulda's advocate made clear the false representations from Eisenstadt that he had learned about thus far, BDML requested documents from Eisenstadt and from Leshkowitz supporting his defense.  Eisenstadt claimed that he would comply with BDML's demand for records but said that he did not want any records given to Fulda, as he was afraid that Fulda would provide them to the District Attorney's Office.  This expressed fear led Fulda and his advocate to question what could possibly be contained in the missing records.

77.    BDML made more than half a dozen requests for the records supposedly held by Leshkowitz without response; finally, at the end of September, Leshkowitz told BDML that he did not have any documents after all and that Eisenstadt would handle the document production.  Another month passed without any records being provided to either Fulda or BDML.  At the end of October, Fulda's advocate asked BDML to issue a judgment on his behalf, as the records were still outstanding.  He repeated this request at the beginning of November, 2019.

78.    On November 7, 2109, BDML made a "final" request to Eisenstadt for the records that he had described two months earlier.  Rather than receiving a response from Eisenstadt or his advocate, Eisenstadt's brother Ira Eisenstadt contacted BDML saying that the family was now handling the matter and asking for another 30 to 45 days for Leshkowitz to prepare and produce the documents.  BDML

agreed to allow the family additional time to comply over the objection of Fulda's advocate, who pointed out that the records had been sought without success for more than two months and that Leshkowitz had already denied having anything to produce.

79.    On November 23, 2019, a new advocate contacted BDML on behalf of the Eisenstadt family, asking for an additional two weeks.  BDML again agreed.

80.    On December 6, 2019, after the two weeks had passed and there were still no documents forthcoming, Fulda's advocate renewed his request for BDML to issue their judgment on the matter.  Once again, Eisenstadt asked for more time to comply and once again BDML agreed to wait.

81.    At some point during the month of December, Fulda learned for the first time that he was not the only victim of Eisenstadt's fraudulent schemes.  Two suits had been filed the previous month in Rockland County Supreme Court. The first alleged that Eisenstadt, AFS, Chesed, M.S. Petroleum and Blue Jay had made fraudulent misrepresentations as part of a "Ponzi scheme" effort to obtain loans from the plaintiffs, that such loans were obtained between December 2018 and May 2019, and that as a result, Defendants had stolen more than $285,000.00 from the plaintiffs in that matter.  The second suit sought to enforce an arbitration provision in an investment agreement very similar to that entered into by Fulda in which Eisenstadt, his wife Shirley Kleinbart and AFS had received $200,000.00 from yet another

investor on July 27, 2018, had breached the contract, and had been avoiding the jurisdiction of the Rabbinical justice system.[3]

82.    In addition to the suits discovered by Fulda, two other legal actions were filed against Eisenstadt around this same time period.  In October of 2019, one of Eisenstadt's fuel suppliers sued him, along with Knopfler and AFS, to recover approximately $58,000.00 in overdue bills.  Shortly thereafter, in December of 2019, American Express filed suit against Eisenstadt to recover unpaid credit card charges exceeding $209,000.00.  This suit by American Express did not involve the charges Chesed had made on Malka's account but, rather, were connected to an unrelated card issued in Eisenstadt's name.  The multiple legal filings against Eisenstadt revealed both his efforts to avoid repaying his debts and the extent of his fraudulent behavior in incurring the debts to begin with.

83.    Fulda was also shocked to learn about the level of involvement of Waldman, one of the signatories to the investment agreement that formed the basis of the second Rockland County filing.  Fulda learned that Waldman was processing credit card charges in a circular fashion on behalf of Eisenstadt and his businesses, without any products or services ever being exchanged.  This credit card processing

---

[3] Although this second suit was later withdrawn so that the parties could undergo Rabbinical arbitration, Eisenstadt followed a similar pattern of avoidance and delay with that plaintiff.  A new suit was filed in a further effort to bring Eisenstadt to arbitration in August of 2020 and remains pending in Rockland County, New York.

scheme had been used by Eisenstadt to inflate the apparent revenues of his businesses, as well as to generate funds without ever actually repaying them.

84.     On December 18, 2019, BDML sent yet another request for documents, this time seeking them from Eisenstadt, Leshkowitz, and two additional people. Only one of the recipients responded, yielding the first paperwork that BDML had received from anyone on Eisenstadt's behalf since the matter had started over three months earlier.  On December 30, 2019, at the request of Fulda's advocate, BDML renewed its document request from all of the parties who had yet to respond.

85.     On January 3, 2020, Eisenstadt's advocate provided a single profit and loss statement.  As this was not an original document and failed to support Eisenstadt's claims, BDML sent yet another document request on January 9th.  When this request, like the many preceding it, failed to obtain a response, Fulda's advocate renewed his request for BDML to issue its judgment.

86.     On January 15, 2020, Eisenstadt finally responded by supplying documents, many in the form of Excel spreadsheets, that were actually responsive to BDML's repeated demands.   Fulda hired two accountants to review the paperwork, finding multiple irregularities including:

      a. There were numerous bank accounts and business accounts that Fulda had been completely unaware of, showing the steady shifting of funds between the Defendant entities;

    b.  The businesses allegedly did a combined total of approximately 7-8 million dollars in sales but inexplicably had debits and deposits in excess of 80 million dollars;

    c.  Multiple transfers in and out of the businesses were made to family members.  Some were made to or on behalf of Helen, who was a part owner of the business, but there were also several transfers to Ira, Jay, Kleinbart and Avigail;

    d.  On the date of Fulda's initial $150,000 investment, $140,000 was transferred to Helen and $9,000 to Waldman in spite of the specific restriction in Fulda's investment agreement limiting the use of his funds to designated customers of the business.

87.    Following these shocking disclosures, BDML held a second session on the matter on January 30, 2020.  Eisenstadt admitted for the first time that he had needed Fulda's investment so that Helen, one of the partners in AFS, would continue to loan money to AFS.  Eisenstadt also admitted that he and Waldman had been cycling credit card charges as a further way of both financing the business and inflating the revenue numbers so that it appeared that there were more business transactions than actually existed.  Finally, Eisenstadt provided profit and loss statements to BDML during the same session that contained yet another version of the AFS finances.

88.    BDML completed their fact finding at the January 30th session; however, Eisenstadt had not yet paid his half of the fees for their work.  This further delayed the issuance of a judgment.  Finally, on February 10, 2020, BDML issued a *Psak Din* ordering Eisenstadt to pay $400,000.00 to Fulda.  Eisenstadt and his advocate pressed for BDML to reopen the matter and hold an additional hearing; Fulda agreed to another session if Eisenstadt would place funds in escrow to cover the judgment.  Eisenstadt refused to place funds in escrow, but did not indicate that he lacked the funds to pay; rather, he continued to protest the validity of the debts owed to Fulda, the position that he had taken in front of BDML.

89.    Two more weeks passed without any further word from Eisenstadt.  On February 26, 2020, Fulda's advocate informed BDML and Eisenstadt's advocate that, unless the judgment was paid, Fulda would seek to have it confirmed in a secular court in March.  The following day, six separate confessions of judgment were filed against both Eisenstadt and AFS in Rockland County Supreme Court; the confessions of judgment, most of which had been signed months earlier, were all on behalf of Zomi Management, a "company" managed solely by Jay.  The effect of the immediate filing of these confessions of judgment, regardless of their legitimacy or lack thereof, was to push Fulda's as yet unfiled claim to the back of the line, thus essentially rendering Eisenstadt and AFS judgment-proof.

90.     Jay and Zomi Management continued to file judgments against AFS and Eisenstadt over the next few months, in a transparent effort to ensure that no other creditor would be able to use the judicial system to actually recoup their losses. The attorney representing Jay and Zomi in obtaining the confessions of judgment from Eisenstadt and AFS, and ensuring that each was properly documented and protected, was Steven J. Shore, Esq..  Shore was familiar with Eisenstadt's legal difficulties, as he represented him and/or AFS in some of those matters.  Zomi filed three additional confessions of judgment on March 6, 2020, another on March 13, 2020, three more on March 18, 2020, another on June 3, 2020, two on June 26, 2020, and finally two more on July 13, 2020.  While the majority of these confessions of judgment purported to be funds loaned by Zomi/Jay to Eisenstadt or AFS, two of them reflected that Zomi had purchased debt claims from other, arms-length creditors.  This pattern is consistent with the Eisenstadt family's effort to interfere with the proceedings in front of BDML and otherwise shield Eisenstadt and his entities from the financial woes caused by their fraudulent conduct.

91.     On March 2, 2020, when Eisenstadt continued to ignore the BDML *Psak*, BDML finally issued a *Heter Arkaos* with unusually broad language.  The *Heter* noted that Eisenstadt was refusing to comply with the *Psak* and granted Fulda blanket permission to pursue his claim against Eisenstadt civilly.

92.     Despite the issuance of the clear *Heter*, Fulda and his advocate continued to attempt to negotiate with Eisenstadt through his advocate.  Fulda remained concerned that pursuing his full claim could cause a rift in the religious community.  As a result, he tried for several months to persuade Eisenstadt to make good on his debts.  Eisenstadt never indicated that he intended to comply with the BDML *Psak* but, rather, made increasingly lower offers either through his advocate or through family members.  For example, on May 1, 2020, Fulda's advocate spoke with Ira and another of Eisenstadt's brothers in a final effort to make the family aware of the seriousness of the situation.  Ira disregarded the BDML *Psak* but offered to settle for approximately 20% of what Fulda was owed.

## FIRST COUNT
### (Securities Fraud)

93.     All previous paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

94.     This Count is asserted against Defendants MARC EISENSTADT a/k/a MEIR EISENSTADT, AUTO FILLING SERVICES LLC, YAAKOV YOUNG, and ARI MARBURGER is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

95.     During the relevant time period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly

engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and did: (i) deceive the Plaintiffs, as alleged herein; and (ii) cause Plaintiffs to agree to the terms of each investment agreement. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

96.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of Defendants participated directly or indirectly in the preparation and/or issuance of profit and loss statements, Excel spreadsheets, charts and other statements and documents described above, as well as oral statements directly to Plaintiffs. Such reports, documents and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Defendants' financial well-being, plans and intentions.

97.     The Plaintiff had no obligation to invest in AFS or any of the Defendant entities and could have singlehandedly rejected the deal. Instead, Plaintiff relied upon the fraudulent misrepresentations of the Defendants in agreeing to the

provisions of each investment agreement.   Specifically, Plaintiff relied upon the following misrepresentations by Defendants:

a.  Defendants claimed to have a business averaging or exceeding $700,000 per month in credit card sales alone.  This representation was materially false, as Defendants were cycling credit card charges to create the appearance rather than the reality of revenue.

b.  Defendants represented the economic picture of AFS through the use of spreadsheets, profit and loss statements and charts, all of which portrayed a growing company with a very healthy profit margin.  This representation was also materially false, as Defendants had modified the true numbers as later revealed by documents presented during the Bais Din effort at arbitration containing very different information.

c.  Eisenstadt claimed to be running profitable businesses with minimal debt. This representation was materially false, as Eisenstadt later admitted to having over a million dollars in debt that was not properly reflected in the accounts of AFS.

98.    Had Defendants not made these fraudulent misrepresentations, Plaintiffs would never have entered into the investment agreements or allowed charges to be made on any credit card or account.  Plaintiffs justifiably relied upon

Defendants misrepresentations that AFS was a growing and profitable company that would provide a steady return upon investments.

99.    By virtue of their positions at AFS or connections to Eisenstadt, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

100.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As Defendants have repeatedly attempted to evade or tamper with any form of document production, the majority of accurate financial records remain unavailable to Plaintiff.

101.    The Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Defendants were able to and did, directly or indirectly, control the content of the

statements. As officers and/or directors of AFS, the Defendants had a duty to disseminate timely, accurate, and truthful information with respect to AFS's businesses, operations, future financial condition and future prospects, as they related to the solicitation of investments from Plaintiffs. As a result of the dissemination of the aforementioned false and misleading reports, spreadsheets and statements, Plaintiffs invested in AFS on multiple occasions and were damaged thereby.

102. Each Defendant acted in concert with the other Defendants and provided each of the others with substantial assistance in making the fraudulent representations, statements and omissions that led to Plaintiffs reliance.  Defendants could not have perpetrated their fraud, or consummated their plan to obtain investments in AFS, without the substantial assistance of the others in making the fraudulent statements, representations and omissions, and each Defendant benefitted from the conduct of the others.

103.  By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

104.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their serial investments in the Company.

## SECOND COUNT
### (Unjust Enrichment)

105.   All previous paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

106.   This Count is asserted against Defendants MARC EISENSTADT a/k/a MEIR EISENSTADT, HELEN EISENSTADT, AARON KNOPFLER, SHIRLEY KLEINBART, JAY EISENSTADT, IRA EISENSTADT, AVIGAIL EISENSTADT, YAAKOV YOUNG, MICHAEL WEISS, ARI MARBURGER, ELI LESHKOWITZ and MOSHE WALDMAN for their joint and several actions leading to the unjust enrichment of Defendants at the expense and to the detriment of Plaintiffs.

107.   During the relevant time period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud Plaintiffs. Such scheme was intended to, and did: (i) deceive the Plaintiffs, as alleged herein; and (ii) cause Plaintiffs to agree to the terms of the investment agreements. In furtherance of this

unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

108.   The Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Defendants Eisenstadt, Knopfler, Young and Waldman were able to and did, directly or indirectly, control the content of the statements made to Plaintiffs.

109.   Defendants Helen, Ira, Jay, Kleinbart, and Marburger all profited financially from the actions of Defendants Eisenstadt, Knopfler, Young and Waldman in that they received funds from the Defendant entities and from Plaintiffs' investments in those entities, without any form of compensation to Plaintiffs and when they were not the intended beneficiaries of Plaintiffs' investments.

110.   Defendant Jay's filing of multiple confessions of judgment, by and through Zomi Management, has acted as a shield against litigation and recovery preventing Plaintiffs from recovering any of the funds obtained and shared by Defendants.

111.   Defendants' commission of the conduct alleged herein was unlawful, unjust and improper.  Plaintiffs' reliance upon that conduct, both acts and omissions, led to the unjust enrichment of Defendants both from the proceeds of the investments and the credit card charges, as well as from the subsequent avoidance of repayment by Eisenstadt and AFS.

112.   Defendants' actions by which they were enriched violated fundamental principles of justice, equity and good conscience. It is against equity and good conscience to permit Defendants to continue to be enriched at Plaintiffs' expense by allowing them to retain Plaintiffs' property.

113.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their investments into and financial support of Defendant entities.

### THIRD COUNT
### (Breach of Contract)

114.   All prior paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

115.   This Count is asserted against MARC EISENSTADT a/k/a MEIR EISENSTADT and AUTO FILLING SERVICES LLC for their breach of written investment agreements with Plaintiff.

116.   On March 30, 2018, Plaintiff and Defendants entered into a written investment contract whereby Plaintiff invested money ($150,000.00) into Defendant AFS with a specified arrangement in which the first 3 1/4 % of profits was to be remitted to Plaintiff and any further profits were to be retained by the Defendants. This agreement was prepared, signed and agreed to by Eisenstadt.

117.   On April 4, 2018, Plaintiff and Defendants entered into a written investment contract whereby Plaintiff invested money ($100,000.00) into Defendant

AFS with a specified arrangement in which the first 2 1/2 % of profits was to be remitted to Plaintiff and any further profits were to be retained by the Defendants. This agreement was prepared, signed and agreed to by Eisenstadt.

118.   Plaintiff performed his obligation under both investment contracts by providing the entire agreed upon amount to Defendants on the dates of execution.

119.   Defendants failed to perform under the contract, in that they did not make timely or complete payments and stopped making any payments as of August 2018.

120.   Defendants have continued to retain the full use and benefit of the funds invested by Plaintiff.

121.   As a direct and proximate result of Defendant's breach, Plaintiff has suffered injury in terms of lost capital and lost investment opportunities, in an amount to be proven at trial.

**FOURTH COUNT**
**(Constructive Trust)**

122.   All prior paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

123.   This Count is asserted against MEIR EISENSTADT a/k/a MARC EISENSTADT, AUTO FILLING SERVICES LLC, CHESED 1 LLC, M.S. PETROLEUM LLC, BLUE JAY PETRO LLC, FUELFILLED LLC, YAAKOV

YOUNG and AARON KNOPFLER for making false statements in violation of their fiduciary duty and inducing Plaintiff to enter into investments thereby, which unjustly enriched the Defendants.

124.   Plaintiff Fulda was an investor in AFS.   As such, Defendants Eisenstadt, Young and Knopfler owed him a fiduciary duty.  Defendants breached this duty by continually providing false and misleading information in an effort to solicit further investments from Plaintiff, or to prevent him from recovering on his previous investments.

125.   Defendants promised to repay Plaintiff and made multiple schedules and arrangements for doing so.

126.   Plaintiff invested $617,398.90 in funds into Defendant AFS and Defendant Chesed 1 in reliance upon the repeated false promises of Defendants.

127.   Defendants were unjustly enriched as a result of Plaintiff's reasonable reliance upon their false promises.

### FIFTH COUNT
### (Fraudulent Conveyance)

128.   All prior paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

129.   This Count is asserted against MEIR EISENSTADT a/k/a MARC EISENSTADT, AUTO FILLING SERVICES LLC, CHESED 1 LLC, M.S.

PETROLEUM LLC, BLUE JAY PETRO LLC, FUELFILLED INC., HELEN EISENSTADT, AARON KNOPFLER, SHIRLEY KLEINBART, JAY EISENSTADT, IRA EISENSTADT, AVIGAIL EISENSTADT, YAAKOV YOUNG, MICHAEL WEISS, ARI MARBURGER and MOSHE WALDMAN for their conveyance of funds intended to hinder, defraud or delay creditors while enriching themselves.

130.   Plaintiffs were creditors of Eisenstadt, AFS and Chesed at the time that Defendants made conveyances amongst themselves and to third parties with the intention of incurring debts beyond their ability to pay and of hindering or delaying the recovery of funds by Plaintiffs.

131.   At all times relevant, Defendants Eisenstadt, AFS, Chesed, and the related entities made conveyances to family members and associates without fair consideration.  These conveyances had the effect of rendering Defendants insolvent and defrauding Plaintiffs.

132.   Defendants Helen, Jay, Ira, Kleinbart, Weiss, Waldman and Marburger participated in the conveyances as transferees or beneficiaries and were enriched thereby.  Corporate Defendants M.S. Petroleum, Blue Jay and Fuelfilled similarly participated in the conveyances as transferees and were enriched thereby.

133.   As a result of Defendants' actions, Defendants hindered or delayed recovery by Plaintiffs, thereby causing lasting economic harm to Plaintiffs.

47

## SIXTH COUNT
### (Declaratory Judgment – American Express)

134.   All prior paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

135.   An actual controversy has arisen and now exists between Plaintiff and Defendant concerning the following matters:

a.   Whether Defendant American Express improperly recovered funds from Defendant Eisenstadt without then remitting them to Plaintiff Malka Fulda; and

b.   Whether Defendant American Express's failure to flag the questioned charges as fraudulent contributed to the losses suffered by Plaintiffs,

136.   All necessary parties are before this Court.

137.   The amount in controversy exceeds the jurisdictional threshold of this Court.

138.   Plaintiff does not have an adequate remedy at law.

139.   Plaintiffs are in adversarial conflict with Defendant American Express over the legal ownership of the funds.

140.   Judicial declarations are necessary and appropriate at this time to enable the parties to ascertain their rights and duties to each other.

141.   Based upon the foregoing, Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201, determining as follows:

48

a. The charges made by Chesed 1 on Malka Fulda's American Express account, and paid by Plaintiffs, should be credited to Plaintiffs by Defendant American Express regardless of whether Defendant American Express has successfully recovered those funds from the remaining Defendants.

b. Plaintiff has already suffered damages by Defendant's acceptance of payment from Plaintiffs despite Defendant's failure to flag the charges and recovery of the charges from Defendant Eisenstadt. Therefore, even though Plaintiff has pleaded additional causes of action, for which a jury trial is demanded, a separate speedy hearing on the declaratory judgment action is appropriate, pursuant to Rule 57 of the Federal Rules of Civil Procedure.

## SEVENTH COUNT
### (Declaratory Judgment – Remaining Defendants)

142. All prior paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

143. An actual controversy has arisen and now exists between Plaintiff and Defendants concerning the following matters:

a. Whether Defendants Helen Eisenstadt, Shirley Kleinbart, Jay Eisenstadt, Ira Eisenstadt, Avigail Eisenstadt, Michael Weiss, Ari Marburger, and Moshe Waldman improperly received funds intended for investment into

specific customers and business activities of Defendant AFS that were diverted by or on behalf of Defendant Meir Eisenstadt.

2.     All necessary parties are before this Court.

3.     The amount in controversy exceeds the jurisdictional threshold of this Court.

4.     Plaintiff does not have an adequate remedy at law.

5.     Plaintiffs have acted in reliance upon the representations of Defendants in a manner which has brought them into adversarial conflict with Defendants.

6.     Judicial declarations are necessary and appropriate at this time to enable the parties to ascertain their rights and duties to each other.

7.     Based upon the foregoing, Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201, determining as follows:

a.  The remaining Defendants were improperly and unjustly enriched by the funds invested by Plaintiffs into AFS and are jointly and severally liable for making Plaintiff whole as a result.

b.  Plaintiff has already suffered damages by Defendants misuse of the funds that he intended to invest into AFS. Therefore, even though Plaintiff has pleaded additional causes of action, for which a jury trial is demanded, a separate speedy hearing on the declaratory judgment action is appropriate, pursuant to Rule 57 of the Federal Rules of Civil Procedure.

50

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by jury as to all issues.

**WHEREFORE,** Plaintiffs demand judgment against Defendant for

a.   Compensatory damages;

b.   Punitive damages;

c.   Costs of the Suit, including Attorneys' fees and reasonable expenses;

d.   Ordering the dissolution of the Defendant entities;

e.   Declaratory judgment against American Express awarding the funds recovered from Defendants to Plaintiffs;

f.   Declaratory judgment against Defendants Helen Eisenstadt, Shirley Kleinbart, Jay Eisenstadt, Ira Eisenstadt, Avigail Eisenstadt, Michael Weiss, Ari Marburger, and Moshe Waldman awarding the funds unjustly transferred to them by the business Defendants to Plaintiffs;

g.   Such other and further relief as this Court deems appropriate.

Dated October 22, 2020
          New York, New York

                              Respectfully submitted,


                              *Maryam N. Hadden*

                              Maryam N. Hadden, Esq.
                              Parlatore Law Group, LLC
                              *Attorney for the Plaintiffs*
                              One World Trade Center, Suite 8500
                              New York, New York  10007
                              646-846-6382
                              maryam.hadden@parlatorelawgroup.com


                              Timothy C. Parlatore, Esq.
                              Parlatore Law Group, LLC
                              *Attorney for the Plaintiffs*
                              One World Trade Center, Suite 8500
                              New York, New York 10007
                              212-679-6312
                              212-202-4787 Facsimile
                              timothy.parlatore@parlatorelawgroup.com